JOHN SHERIDAN *vs.* DANIEL E. IRELAND and logs.

Penobscot, 1875.—April 11, 1876.

*Words.—The place of destination for sale. Lien.*

"Penobscot boom" is ordinarily "the place of destination for sale or manufacture," (within the meaning of the statute,) of logs that are driven down the Penobscot river, into such boom.

The sixty days (after the arrival of logs within the boom) within which an attachment must be made, in order to effectuate a laborer's lien thereon, do not commence to run, as to any of the logs upon which the lien exists, until all the logs subject to the same lien have arrived within the boom; provided the logs have been driven together and the driving has not been suspended after a portion of them has reached the boom, but has been continuously kept up till all the logs have been driven in.

ON REPORT.

ASSUMPSIT, on account annexed (August 14, 1872, the date of the writ,) for cutting and hauling logs on No. 7, now in Penobscot river, in and below Penobscot boom, marked N X V I I X girdle at $1.00 per day, $76; "and the plaintiff claims to have a lien on said logs for personal services in cutting and hauling the same during the past winter, to the amount of $76, and this action is brought to enforce said lien according to the statute in such cases made and provided."

The firm of Shaw & Ayer, claimants as owners of the logs, were admitted to defend. The pleadings were the general issue, with brief statement, denying the lien alleged in the writ, for the reason that the logs were not attached within sixty days after their arrival at the place of destination for sale, and alleging that they were for sale, and that their place of destination for sale was Penobscot boom.

The parties agree upon the following facts as pertaining to the case:

"The Penobscot boom is owned by the Penobscot boom company, a corporation established by the laws of Maine. Any of the acts of the legislature, public or private, relating to it, may be used as a part of this case. The said general boom consists of various particular gaps and booms, extending from its lower limits in Argyle and Greenfield to a distance above, of ten miles or more. The boom company has the use of the river for its purposes, between its upper and lower limits. The nearest mills below the lower limits are at Oldtown, about four miles below; and the mills where the lumber, coming through the boom, is manufactured, are situated at Oldtown and in various places below as far down as Bangor, and Hampden inclusive. The boom company's works are maintained and managed by the Penobscot lumbering association, who are lessees of the boom company under the act of the legislature.

A great many millions feet of logs annually arrive into the Penobscot boom, from the waters above, of many different marks, and belonging to many different owners. While in the boom, no separation of them is made, according either to respective marks or ownership, but they are promiscuously intermixed.

Whenever the state of the water is suitable for it, the practice is for the lumbering association, to raft out and make a "boom scale" of the logs at the different gaps, upon which a toll for boomage and rafting is assessed. For this purpose each man's marks are rafted together in separate joints; these joints are dropped away by the boom company, and hitched upon buoys below the gaps where rafted, to remain there for a short time for the owners to take possession of them and take them away.

The practice is for the owners to take the logs away from the buoys and run them down on to shores situated in different places, all the way from the boom, nearly down to the mills at Oldtown. Some owners have shores of their own for this purpose, and sometimes the running is done by persons who make a business of running rafts of logs upon shores owned or rented by them for the purpose, who both run the logs upon their shores, and keep them there for a certain price per thousand feet therefor.

Upon these shores or places of deposit the general practice is for the logs to be scaled again, to ascertain the number of thousands of feet as between the buyer and seller; and the buyer takes the delivery of the logs at these places and carries them thence to places of manufacture below. The buyers sometimes bargain for the purchase of logs before they are in the boom, and sometimes while in the boom, and before any are rafted, and sometimes when upon the shores; but more often a purchaser bargains for a whole or a part of a mark, after a part of them, but not the whole, have been rafted, but the logs to be scaled on the shores below, and to be paid for at a scale there to be made from seller to buyer called a 'sale scale,' the bill being dated on the day of the scale, and interest reckoned thereafter.

In this way an owner's mark comes through the boom from time to time, and generally does not become wholly rafted out till the end of a season; and sometimes, when the boom is not cleared in a season, a portion of it may remain till the next season.

It is admitted that there is due the plaintiff, for his personal services, the amount claimed in the writ, $76; that the services were performed on these logs; that there were no other logs of this mark that came into the possession of the boom company, for lumbering purposes during 1872, and that these logs were sold by Shaw & Ayer, the claimants in this suit."

The logs were attached on the writ August 16, 1872. The evidence tended to show that most of the logs attached had arrived at the Penobscot boom more than sixty days before August 16, the date of the attachment; that small quantities of them continued to arrive from day to day thereafter and that the rear came in and the driving crew was discharged on the 25th or 26th of June.

*L. Barker & L. A. Barker,* for the plaintiff.

*W. H. McCrillis & W. S. Clark,* for the claimants.

PETERS, J. By R. S., c. 91, § 34, a person who labors at cutting or driving logs, has a lien thereon for his personal services; "to continue for sixty days after the logs or lumber arrive at the place of destination for sale or manufacture;" to be enforced

by suit. The case calls for a construction of this provision of the statute in two particulars.

One question is this: what is such "place of destination?" as applicable to logs driven into Penobscot boom on Penobscot river. It appears, that the logs annually coming down the Penobscot river are mostly driven into Penobscot boom, situated above the mills where the logs are to be manufactured, and they are there promiscuously intermixed without regard to their ownership. After this, from time to time, as the logs run through the gaps or outlets of the boom, they are rafted into "joints" by the boom company, according to the marks and ownership of the logs, and then the joints (small rafts) are by the company hitched upon buoys, below the boom, as a place of delivery from the company to the owners. The owners take their logs from the buoys where hitched and run them in joints or rafts still further below, upon the shores of the river at suitable places of deposit, where they may be safely kept until they are removed to the mills from time to time for manufacture. If the log owners do not manufacture them, the logs are usually sold while lying upon the shores, or, if they are contracted to be sold beforehand, are usually delivered there to the purchaser. In this way an owner may not receive all of his mark of logs through the boom before the end of a rafting season, and may not even then, a portion remaining within the boom till the next rafting season afterwards. The logs attached by the plaintiff, to enforce his lien for labor thereon, came into and through the boom in the manner thus described, and were not manufactured by the owners, but were by them sold.

We can have no doubt that the "place of destination" of these logs for "sale or manufacture," was the Penobscot boom. The idea of the legislature evidently was that a drive, (a word used by lumbermen,) or mark of logs, had ordinarily but a single destination. But if the construction contended for by the plaintiff is to prevail, then a lot of logs passing through the boom would have as many and different destinations as the number of persons to whom the aggregate lot in different detachments might be sold, or as the number of different mills where they might be manufactured. And the different destinations would be reached at differ-

ent times, varying through a whole season, and even longer, according to contingencies. By such a rule, the log owners and log purchasers would find it difficult to know when logs are exempted from liability to suit for enforcement of the lien, and the purpose of the statute in fixing a limit to such liability would be practically defeated. The language is, when the logs "arrive." The implication is that the logs have been driven ; that they have been upon a passage ; and that they have come to a rest. The words, "arrive" and "destination," in the statute, are used in a quasi commercial or maritime sense. "The port at which a ship is to end her voyage is called her port of destination." (Bou. Law. Dic.) In this case, the Penobscot boom is the end of the passage or voyage. There, the driving ends. After this the logs are not driven as before, but are propelled in joints or rafts. It is to be noticed, that it is the place of destination "for" sale or manufacture, and not the place "of" sale or the place "of" manufacture itself, that the logs are to arrive at. This construction is more obvious still, by a reinstatement of the words of the original act of 1848, which have been omitted in the revision of the statutes, for the purpose of condensation, or because the words would not be applicable to the mode of business in all places. That act reads thus : "place of destination 'previous to being rafted' for sale or manufacture."

The other question is this : when, for the purposes of attachment, may it be said that the logs have arrived within Penobscot boom ? The plaintiff's position is, that the period of sixty days, (after the arrival of the logs within the boom) within which time an attachment must be made, in order to effectuate the lien, does not commence to run as to any of the logs upon which the lien exists, until all the logs subject to the same lien claims shall have arrived within the boom. On the other hand, the defendant contends that all logs which have remained unattached for sixty days after their arrival within the boom, become exonerated from the lien claim, whether all the logs upon which the lien existed have been there for that period of time or not. In this case, when the logs were attached, a portion of "the mark" of logs, upon which the plaintiff's labor was expended, had been in the boom more

than sixty days, and a portion had not then reached the boom, although the crews were still driving upon them. The probability is, that the logs attached were among those which had arrived in the boom more than sixty days before the attachment was made. Still, we think the attachment was made seasonably. It is well known, in all lumbering communities, that all the logs of "a drive" (so called) do not arrive at their destination at the same time. The head of the drive may be many days in advance of its rear. Detachments of the same driving crew may be at work many miles apart. Logs of the same mark may be running into the boom for many successive days. The laborer's lien is usually upon all of the mark of logs. The lien continues sixty days after "the logs" arrive within the boom, that being their place of destination. "The" logs are "all" of the logs, and not a part of them. Any other construction than this, would lessen the value of a laborer's lien (for driving) greatly. It would be generally impracticable for a laborer to distinguish the logs that come into the boom at different times during the same driving season. And if he was at work on the rear of a drive, in a case where the logs were running into the boom for a period exceeding sixty days, the time within which he is to commence a suit would expire (as to the bulk of the logs) before his contract for labor would be completed. In most cases of such a character the lien upon the logs would be totally lost.

But a question arises, in the arguments of counsel, as to the effect of such a rendering of the statute, in the event that the logs do not all arrive in the same season or upon a continued driving. We do not appreciate any practical difficulty in such a case, although the point is not involved in the facts before us. When a portion of the logs are driven to their place of destination, and the remainder are left behind, and the driving of them abandoned till another season, then it may be said that the driving, (so far as the logs then within the boom are concerned,) is so far completed that the sixty days, as to that portion of them, will thenceforth begin to run. In that case there would virtually be two drives from one lot of logs, each detachment having a time of its own in arriving at the place of destination. But where, as here,

there is an entirety and continuity of driving, the result is other-
wise.                 *Judgment for the plaintiff against the*
                      *personal defendant and against the*
                      *logs.*

APPLETON, C. J., DICKERSON, DANFORTH, VIRGIN and LIBBEY,
JJ., concurred.